# United States Court of Appeals
## For the First Circuit

No. 16-1914

PETER ALFANO,

Plaintiff, Appellant,

v.

THOMAS LYNCH,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,*
and Selya, Circuit Judge.

David Milton, with whom Howard Friedman and Law Offices of
Howard Friedman, P.C. were on brief, for appellant.
Alexandra R. Hassell, with whom Douglas I. Louison and
Louison, Costello, Condon & Pfaff, LLP were on brief, for appellee.

February 1, 2017

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

**SELYA**, **Circuit Judge**.  The doctrine of qualified immunity shields from liability public officials, including police officers, whose conduct does not violate clearly established federal statutory or constitutional rights.  It is a strong, but not impenetrable, shield.  After careful consideration of the record in this case, viewed in the light most favorable to the plaintiff, we conclude that qualified immunity is not available: given the state of the preexisting law, the unconstitutionality of a police officer's actions in taking a person into protective custody, handcuffing that person, transporting him to a police station, and jailing him without probable cause to believe that he is incapacitated should have been apparent.  Consequently, we vacate the district court's entry of summary judgment in the defendant's favor and remand the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

Inasmuch as the court below resolved this case at the summary judgment stage, we rehearse the facts in the light most favorable to the nonmovant (here, the plaintiff), consistent with record support.  See DePoutot v. Raffaelly, 424 F.3d 112, 114 (1st Cir. 2005).

On the morning of July 11, 2014, plaintiff-appellant Peter Alfano and two friends set out to attend a concert at the Xfinity Center in Mansfield, Massachusetts.  They travelled to

Mansfield on a chartered bus that provided round-trip transportation from downtown Boston to the concert venue. The threesome consumed beers both on the bus and at a tailgate party upon their arrival. All told, Alfano (by his own admission) drank between six and eight beers over a span of some four to six hours.

When it came time for the concert to begin, Alfano and his friends made their way to a security checkpoint at the entrance of the amphitheater. Alfano was feeling the effects of the alcohol that he had consumed, but he did not feel out of control. As he reached the checkpoint, two security guards asked him to step out of the line and escorted him to a separate holding area on the Xfinity Center property. There, Alfano was turned over to defendant-appellee Thomas Lynch, a lieutenant from a neighboring town's police department, who was working a security detail at the Xfinity Center. According to Lynch, the security guards told him that they thought that Alfano might be incapacitated and, thus, took him aside for further scrutiny.

Massachusetts law permits police officers to take "incapacitated" persons into civil protective custody. Mass. Gen. Laws ch. 111B, § 8; see id. § 3 (specifying, as pertinent here, that an "[i]ncapacitated" person is one who is both intoxicated and, "by reason of the consumption of intoxicating liquor is . . . likely to suffer or cause physical harm or damage property"). To evaluate whether Alfano was in fact incapacitated, Lynch —

- 3 -

acting under color of state law — asked Alfano to perform a series of field sobriety tests. The parties dispute how Alfano performed on these tests. They agree, however, that he refused to take a breathalyzer test. Following that refusal, Lynch handcuffed Alfano and placed him in protective custody.

At first, Alfano was shackled to a bench. He was later transported to the Mansfield police station (some miles away) and confined in a holding cell. Roughly five hours later, he was released. By that time, the concert was over.

The matter did not end there. In July of 2015, Alfano sued in the federal district court.[1] His complaint alleged, in substance, that Lynch lacked probable cause to take him into protective custody and, accordingly, abridged his Fourth Amendment right against unreasonable seizures. After a course of pretrial discovery, Lynch moved for summary judgment on qualified immunity grounds. Over Alfano's opposition, the district court granted Lynch's motion. See Alfano v. Lynch, No. 15-12943, 2016 WL 2993615, at *3 (D. Mass. May 23, 2016). The court held that the law was not clearly established as to the need for probable cause. See id. This timely appeal ensued.

_____

[1] Alfano brought suit pursuant to 42 U.S.C. § 1983, which furnishes a cause of action against any person who, while acting under color of state law, transgresses someone else's constitutional rights. See Kalina v. Fletcher, 522 U.S. 118, 123 (1997).

## II. ANALYSIS

We review the district court's entry of summary judgment de novo. See DePoutot, 424 F.3d at 117. Summary judgment is appropriate only when the record reflects no genuine issue as to any material fact and discloses that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Schiffmann v. United States, 811 F.3d 519, 524 (1st Cir. 2016).

"[Q]ualified immunity shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Matalon v. Hynnes, 806 F.3d 627, 632-33 (1st Cir. 2015) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine's prophylactic sweep is broad: it leaves unprotected only those officials who, "from an objective standpoint, should have known that their conduct was unlawful." MacDonald v. Town of Eastham, 745 F.3d 8, 11 (1st Cir. 2014) (quoting Haley v. City of Bos., 657 F.3d 39, 47 (1st Cir. 2011)). Put another way, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

The qualified immunity analysis entails a two-step pavane. See Matalon, 806 F.3d at 633 (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). The first step requires an inquiring court to determine whether the plaintiff's version of the facts

- 5 -

makes out a violation of a protected right. See id. The second step requires the court to determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. (citation omitted).

These steps, though framed sequentially, need not be taken in order. See Pearson, 555 U.S. at 236. A court "may alter the choreography in the interests of efficiency," defer the first step, and proceed directly to the second step. Matalon, 806 F.3d at 633. Because that path seems the most efficacious here, we focus initially on the second step, that is, whether the right at issue was clearly established when Lynch confronted Alfano.

The "clearly established" analysis has two sub-parts. See MacDonald, 745 F.3d at 12. The first sub-part requires the plaintiff to identify either "controlling authority" or a "consensus of cases of persuasive authority" sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm. Wilson v. Layne, 526 U.S. 603, 617 (1999); see Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004) (asking "whether the state of the law at the time of the putative violation afforded the defendant fair warning that his or her conduct was unconstitutional"). The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law. See Wilson v. City of Bos., 421 F.3d 45, 57-58 (1st Cir. 2005). The

- 6 -

question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted. See Amsden v. Moran, 904 F.2d 748, 751-52 (1st Cir. 1990).

The first sub-part of this analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (citation omitted). In other words, the clearly established law must not be gauged at too high a level of generality; instead, it must be "particularized" to the facts of the case. Anderson v. Creighton, 483 U.S. 635, 640 (1987). Even so, there is no requirement of identicality. In arguing for clearly established law, a plaintiff is not required to identify cases that address the "particular factual scenario" that characterizes his case. Matalon, 806 F.3d at 633. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning" to public officials, United States v. Lanier, 520 U.S. 259, 271 (1997); rather, the existence of fair and clear warning depends on whether, "in the light of pre-existing law" the unconstitutionality of the challenged conduct is "apparent," Anderson, 483 U.S. at 640. In the last analysis, it is enough if the existing precedents establish the applicable legal rule with sufficient clarity and specificity to put the official on notice

- 7 -

that his contemplated course of conduct will violate that rule. See Matalon, 806 F.3d at 633 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

In applying the test for clearly established law, the focus must be on federal precedents. See Davis v. Scherer, 468 U.S. 183, 193-95 (1984). Courts may consider state precedents, though, to the extent that they analyze the relevant federal issue. See Wilson, 421 F.3d at 56-57; Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 143-44 (1st Cir. 2001).

Here, the initial question reduces to whether — as of the parties' encounter in July of 2014 — controlling and persuasive precedent provided fair and clear notice that the Fourth Amendment requires probable cause before a police officer, acting under a state protective custody statute, can take an individual into protective custody, handcuff the individual, transport him to a police station, and confine him in a jail cell. See Layne, 526 U.S. at 617; Limone, 372 F.3d at 45. We turn next to that question.

It is hornbook law that the Fourth Amendment requires probable cause to place an individual under arrest. See Hayes v. Florida, 470 U.S. 811, 816 (1985). The proper approach, though, is a functional one: for decades, controlling precedent has made pellucid that the probable cause requirement extends to certain types of custody that, though short of an arrest, possess attributes that are characteristic of an arrest. See id.

(explaining that police must have probable cause to effect seizures that are "sufficiently like arrests"); Dunaway v. New York, 442 U.S. 200, 212-13, 216 (1979) (holding that probable cause was required where petitioner's detention, though not styled as an arrest, "was in important respects indistinguishable from a traditional arrest"). Following this logic, the Court — in the absence of express judicial authorization — has insisted upon probable cause when, for example, officers eschew an arrest but detain an individual and transport him to a police station against his will. See Kaupp v. Texas, 538 U.S. 626, 630-31 (2003) (per curiam); Hayes, 470 U.S. at 816. In a similar vein, this court has required probable cause when a detention included "characteristics ordinarily associated with an arrest," such as being placed in handcuffs and "involuntarily transported . . . to an official holding area some distance from the place of the original stop." United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998).

Of particular pertinence for present purposes, we have left no doubt that the Fourth Amendment requires officers acting under a civil protection statute to have probable cause before taking an individual into custody of a kind that resembles an arrest. In Ahern v. O'Donnell, 109 F.3d 809 (1st Cir. 1997) (per curiam), we considered the Fourth Amendment implications of actions taken under a Massachusetts civil protection statute that

allows a police officer to restrain and seek hospitalization of an individual when he has reason to believe that the failure to do so "would create a likelihood of serious harm by reason of mental illness." Id. at 816 (quoting Mass. Gen. Laws ch. 123, § 12(a)). Observing that "involuntary hospitalization is no less a loss of liberty than an arrest," we held that the Fourth Amendment's safeguards against unreasonable seizures extended to protective custody on mental health grounds. Id. at 817.

Our holding in Ahern is not an outlier but, rather, reflects clearly established law. It comports with substantially identical holdings in other circuits. See, e.g., Cantrell v. City of Murphy, 666 F.3d 911, 923 & n.8 (5th Cir. 2012); Roberts v. Spielman, 643 F.3d 899, 905 (11th Cir. 2011); Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003); Monday v. Ouellette, 118 F.3d 1099, 1102 (6th Cir. 1997); Pino v. Higgs, 75 F.3d 1461, 1467-68 (10th Cir. 1996); Sherman v. Four Cty. Counseling Ctr., 987 F.2d 397, 401 (7th Cir. 1993); Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993); Maag v. Wessler, 960 F.2d 773, 775-76 (9th Cir. 1991) (per curiam).[2]

_____

[2] Our decision in Veiga v. McGee, 26 F.3d 1206, 1214 (1st Cir. 1994), is not at odds with this line of cases. Although that decision did assess whether officer defendants acted reasonably under Mass. Gen. Laws ch. 111B, §§ 3, 8, it did not assess the level of suspicion required to take an individual into custody thereunder.

To be sure, the scenario presented in Ahern is not entirely congruent with the scenario faced by Lynch. In our view, however, the parallels are close enough to have afforded a reasonable officer in Lynch's position fair and clear warning that his conduct was unconstitutional. See Hope, 536 U.S. at 741 (explaining that, in determining the existence of clearly established law, cases with identical facts are not required); Limone, 372 F.3d at 48 (similar). In other words, given the controlling and persuasive precedents and the notice that those precedents provided, the unlawfulness of Lynch's actions should have been apparent to him. No more was exigible to satisfy the first sub-part of the "clearly established" analysis. See Anderson, 483 U.S. at 640.

The Tenth Circuit reached the same conclusion in Anaya v. Crossroads Managed Care Systems, Inc., 195 F.3d 584 (10th Cir. 1999). There, the court — relying on much the same consensus of cases assembled in Ahern — held that it was clearly established that the Fourth Amendment required probable cause to take an allegedly incapacitated individual into protective custody under a municipal civil protection policy.[3] See id. at 590-91, 594. The court found the analogy between inebriated persons and the mentally

_____

[3] The municipal policy at issue in Anaya was substantially similar to the Massachusetts statute under which Lynch was acting. Compare Anaya, 195 F.3d at 589 (quoting Trinidad, Colo. Police Dept. Order 95-04) with Mass. Gen. Laws ch. 111B, §§ 3, 8.

ill compelling: it observed that "the context of protecting the public from the mentally ill is directly analogous to that of protecting the public from the intoxicated." Id. at 594-95. Anaya, then, buttresses the view that the probable cause requirement for effecting seizures of incapacitated persons was clearly established at the time Alfano and Lynch crossed paths.

Because no Massachusetts reported cases analyze whether and to what extent the Fourth Amendment requires probable cause to take an individual into protective custody under the relevant statute, we could end our analysis here. See Scherer, 468 U.S. at 193-95; Starlight Sugar, 253 F.3d at 143-44. We think it useful to note, however, that a decision of the state's highest court, the Massachusetts Supreme Judicial Court (SJC), confirms the result to which the federal cases unambiguously point. In Commonwealth v. O'Brien, 750 N.E.2d 1000 (Mass. 2001), the SJC stated (apparently as a matter of state law) that "[t]o take someone into protective custody, officers need . . . probable cause to believe that the person is 'incapacitated' within the meaning of [the protective custody statute]." Id. at 1007.

To be sure, other Massachusetts courts have been more recondite. The Massachusetts Appeals Court, for example, has authored Janus-like decisions that appear to face in conflicting directions. Compare Commonwealth v. Nickerson, 948 N.E.2d 906, 913 (Mass. App. Ct. 2011) (suggesting that "reasonable suspicion"

- 12 -

standard applies), with Commonwealth v. Thomas, 902 N.E.2d 433, at *1 (Mass. App. Ct. 2009) (unpublished table opinion) (stating that "probable cause" standard applies) and Commonwealth v. Silva, 824 N.E.2d 487, at *2 n.3 (Mass. App. Ct. 2005) (unpublished table opinion) (same) and Commonwealth v. St. Hilaire, 686 N.E.2d 1045, 1048 (Mass. App. Ct. 1997) (interpreting state precedent to mean that probable cause "is ordinarily the standard to be applied in protective custody cases").  We regard these decisions as being of little consequence because none of them purports to analyze the question in Fourth Amendment terms and because the SJC (which has been crystal clear on the issue) is the ultimate arbiter of Massachusetts law.  Federal courts of appeals typically look only to precedents from the United States Supreme Court, federal appellate courts, and the highest court of the state in which a case arises to gauge whether a particular right is clearly established.  See, e.g., Hill v. Crum, 727 F.3d 312, 322 (4th Cir. 2013); Lederman v. United States, 291 F.3d 36, 47-48 (D.C. Cir. 2002); Neague v. Cynkar, 258 F.3d 504, 507 (6th Cir. 2001); Jenkins ex rel. Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997) (en banc).

To say more about the clearly established nature of the law would be to paint the lily.  We hold that, in July of 2014, controlling and persuasive authority combined to give a reasonable officer fair and clear warning that the Fourth Amendment required

probable cause to take an individual into protective custody, handcuff him, transport him to a police station miles away, and confine him in a jail cell.[4]

This holding does not end our odyssey. Concluding, as we do, that the probable cause requirement is clearly established, what remains to be done "reduces to the test of objective legal reasonableness." Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998). Our resolution of this point turns on whether an objectively reasonable officer would have believed he had probable cause to take Alfano into protective custody within the meaning of the relevant protective custody statute. To make this judgment, we must consider whether Lynch's decision to deem Alfano incapacitated, take him into protective custody, handcuff him, transport him to the police station, and confine him in a jail cell was the kind of decision (whether or not correct) that a reasonable officer standing in Lynch's shoes would have reached. See id. at 7.

---

[4] It is critical to our holding that Alfano was subjected to a deprivation of liberty that resembled an arrest. We take no view as to whether something less than probable cause might justify a briefer, less intrusive detention under the Massachusetts protective custody statute. See Commonwealth v. McCaffery, 732 N.E.2d 911, 914 (Mass. App. Ct. 2000); cf. Terry v. Ohio, 392 U.S. 1, 30-31 (1968) (requiring only reasonable suspicion for a brief investigatory stop).

For probable cause to have existed, the facts known to Lynch would have had to "give rise to a reasonable likelihood," Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004), that Alfano was both intoxicated and incapacitated (that is, apt to harm himself, to harm someone else, or to damage property),[5] see Mass. Gen. Laws ch. 111B, § 3. This is a fact-specific determination: a qualified immunity defense cannot prevail unless the officer's conduct can be justified in light of the facts. See Morelli v. Webster, 552 F.3d 12, 24 (1st Cir. 2009).

Given that the district court resolved the qualified immunity question at summary judgment, we must take as true (for purposes of our probable cause inquiry) Alfano's supportable version of the facts. See id. at 24-25. By "supportable," we mean that we give credence only to facts that derive support from affidavits or other materials of evidentiary quality contained in the summary judgment record. See Garside v. Osco Drug, Inc., 895 F.2d 46, 49-50 (1st Cir. 1990).

On Alfano's supportable version of the facts, Lynch took him into protective custody after Alfano was denied admission to

---

[5] For the sake of completeness, we note that the Massachusetts protective custody statute limns a trio of other grounds for finding a person incapacitated. See Mass. Gen. Laws ch. 111B, § 3 (specifying that an intoxicated person may also be incapacitated if he is unconscious, in need of medical attention, or disorderly). Lynch does not claim that any of these other grounds has relevance here.

the concert and brought to Lynch, who administered three field sobriety tests and unsuccessfully requested that Alfano agree to a breathalyzer test. Alfano admits that he failed the first field sobriety test (the one-leg stand) but maintains that he passed the second and third tests (which involve, respectively, reciting the alphabet and carrying out a horizontal gaze nystagmus exercise). In his view, these test results revealed only what Lynch already knew: that Alfano had been drinking and was under the influence of alcohol.

Alfano explains that he refused a breathalyzer test because he had already arranged bus transportation back to Boston and would not be operating a motor vehicle. He adds that Lynch — who had been told that Alfano was travelling by bus — had no reason to think that he was planning to drive.

Alfano insists that he was walking normally, steady on his feet (not stumbling, swaying, or lurching), and speaking clearly and in conversational tones. He asserts that he responded to Lynch's questions in an alert and coherent manner; that he was generally cooperative and well-mannered throughout his interactions with Lynch and other security personnel; and that he was in no visible distress. The record, viewed favorably to Alfano, contains no facts indicating that Alfano was likely to harm himself, injure another person, or damage property.

The short of it is that Lynch may well have had probable cause to believe that Alfano was intoxicated. Here, however, Lynch's reasons for placing Alfano into protective custody did not extend beyond probable cause to think that Alfano was intoxicated, and intoxication alone is not sufficient to warrant a finding of incapacitation. See Veiga v. McGee, 26 F.3d 1206, 1210 (1st Cir. 1994). The summary judgment record, construed in the light most favorable to Alfano, simply does not support a conclusion that Lynch had adequate reason to believe that Alfano, though intoxicated, was likely to harm himself or anyone else or to damage property. See, e.g., Nickerson, 948 N.E.2d at 913 (finding no incapacitation when defendant appeared intoxicated but was otherwise able to "converse coherently" and "relate appropriately" with police).

That ends this aspect of the matter. We readily acknowledge that Lynch's version of the facts differs in many respects from Alfano's account. Those factual disputes, however, must await resolution at a trial; at the summary judgment stage, it is Alfano's version that controls. See Morelli, 552 F.3d at 24-25. On that version, a rational jury would have no choice but to find that Lynch's determination of incapacitation was made without probable cause and was objectively unreasonable. It follows that — contrary to the district court's view — the

- 17 -

qualified immunity defense was not available to Lynch.  See id. at 25.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we vacate the entry of summary judgment and remand for further proceedings consistent with this opinion.  Costs shall be taxed in Alfano's favor.


**So ordered.**